FILED

2018 Jan-19  PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| WILLIE ABNER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | Civil Action No. 2:15-cv-02040 |
| UNITED STATES PIPE AND ) | |
| FOUNDRY COMPANY, LLC AND ) | This Document Relates Only to |
| MUELLER WATER PRODUCTS, ) | Case 2:15-cv-02050 |
| INC., ) | |
| ) | |
| ) | |
| Defendants. ) | |

## SECOND AMENDED COMPLAINT

COME NOW the Plaintiffs (both named in the above style, and as listed on "Exhibit 1"), by and through their undersigned counsel, and file this complaint and state as follows:

## NATURE OF COMPLAINT

1.      This is a civil action for equitable relief, compensatory and punitive damages, costs incurred and to be incurred by Plaintiffs, and any other damages which the Court or jury may deem appropriate for personal injury, wrongful death, and/or property damage arising from the intentional, knowing, reckless, and negligent acts and omissions of United States Pipe and Foundry Company, LLC and Mueller Water Products, Inc. (hereinafter referred to as "U.S. Pipe" or

"Defendants") in connection with contamination of the residential areas surrounding their North Birmingham plant located at or around 3000 30th Avenue North, Birmingham, Alabama 35207 (hereinafter referred to as "the Plant") in which Plaintiffs lived, worked, and/or frequented and also owned real property.

## PARTIES AND JURISDICTION

2.      Plaintiff, Harold Banks, is over 19 years of age and is a citizen and resident of Jefferson County, Alabama.   Attached hereto as "Exhibit 1" are additional Plaintiffs who bring the present suit.  Said Plaintiffs are over 19 years of age, and their respective residency is listed on "Exhibit 1".  All such Plaintiffs are incorporated herein as if named in the above-style, and collectively will be referred to as "Plaintiffs" hereafter.

3.      Defendant, United States Pipe and Foundry Company, LLC, is, upon information and belief, an Alabama limited liability company with its principal place of business located in Birmingham, AL.  This Defendant may be lawfully served with the summons and a copy of this Complaint upon its registered agent: CSC Lawyers Incorporating Service, Inc., 150 South Perry Street, Montgomery, Alabama, 36104.

4.      Defendant, Mueller Water Products, Inc., is, upon information and belief, a Delaware corporation with its principal place of business located in Atlanta, Georgia.  This Defendant may be lawfully served with the summons and a

copy of this Complaint upon its registered agent:  The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

5.    The Defendants are subject to the jurisdiction of this Honorable Court on the grounds (a) that one or more of the Defendants is a domestic corporation organized and existing under the laws of the State of Alabama and (b) that one or more of the Defendants is a foreign corporation that either are registered to conduct business in the State of Alabama or that actually transacted business in Alabama or that are successors of such corporations.

6.    Venue is proper in this Honorable Court because the cause of action arose in Jefferson County, Alabama.

## BACKGROUND FACTS

**Defendants' Corporate History**

7.    This action concerns the Defendants' pollution of certain neighborhoods with toxic substances including, but not limited to, lead, arsenic, benzene, xylenes, beryllium, volatile organic compounds (hereinafter known as "VOCs"), and other hazardous substances and waste materials (hereinafter collectively known as "the Contaminants").  These Contaminants had an immediate and/or permanent adverse effect upon human health and the natural environment in which the Plaintiffs lived, worked, and/or frequented and also owned real property.

8.     The Plant began operating in 1901 as a ductile iron foundry owned by The Dimmick Pipe Company.  The Plant casted and sold iron pipes in sizes ranging from 4-24 inches with initial production coming from four pits at a rate of 150-175 tons per day.  This process utilized cupola furnaces to melt the metal which was then cast in pipe molds.

9.     The original U.S. Pipe, United States Cast Iron Pipe and Foundry Company, was incorporated in 1899, and it purchased the Plant from Dimmick in 1911.  A few years later, a second shop was added on, producing 30-60 inch pipes at a rate of 125 tons per day.

10.     In the 1920's, the Plant integrated a new pipe production process known as centrifugal casting, which consisted of introducing molten iron into a rapidly rotating steel mold, allowing for mass production of a superior quality pipe. The facilities at the Plant eventually consisted of the foundry, a landfill for the disposal of solid wastes, several treatment ponds, and pipe storage yards.

11.     In 1969, the Jim Walter Corporation of Tampa, Florida acquired the Plant.  After a recapitalization in 1995, the company was listed on the New York Stock Exchange as Walter Industries, Inc.

12.     By the 1990's, annual production had hit a peak in the range of 190,000-220,000 tons, which was sustained through the early 2000's.  Operations

slowed down with the economy in 2008 as the company's workforce at the Plant was reduced by a third.

13.     In 2005, Walter Industries acquired Mueller Water Products, Inc., and in 2006, United States Pipe and Foundry Company, LLC and Mueller Water Products, Inc. were both spun off into a newly publicly traded company called Mueller Water Products, Inc.   Upon information and belief, Mueller Water Products, Inc. acquired many of the environmental liabilities associated with both past and ongoing operations of the Plant as a part of this transaction, including at least partial liability for the Releases alleged in this Complaint.

14.     Upon information and belief and at all times relevant herein, United States Pipe and Foundry Company, LLC was directly responsible for the ongoing operation of the Plant or was the direct continuation and successor entity of the prior entities that operated the Plant.

15.     Operations permanently ceased in 2010, and the Plant itself was demolished in April 2012 shortly after Mueller Water Products completed the sale of United States Pipe and Foundry Company, LLC to USP Holdings, Inc.   Upon information and belief, the sale of the North Birmingham plant did not remove all of the liabilities associated with the Mueller defendant.

**Defendants' Operations and Toxic Emissions**

16.     The Defendants' operated a cupola melting furnace at the Plant.  This type of furnace typically burned coke to melt iron scrap used for casting pipes. Once molten, the iron would be treated with various chemicals to convert the brittle cast iron into ductile iron.

17.     Cupola melting furnaces produce a collection of particulate emissions, some of which are captured and disposed of as solid and/or liquid wastes through landfills and wastewater ponds on site and some of which escaped into the air.

18.     Once the molten iron was treated, it was poured into a cast with a bell on it to facilitate the use of gasketed joints during subsequent laying of the pipeline.  A molded sand core was used to form the interior contour of the bell. Organic waste materials are emitted during both the process of making the sand core and its subsequent contact with the molten metal.

19.     Once the pipe has been cast, the exterior surfaces of the pipe were often painted and/or treated with a substance containing VOCs, some of which escape into the air and others that are disposed of as solid and/or liquid waste on site.

20.     As a result of the Defendants' operations from 1911 through 2010, including but not limited to those described above, Defendants emitted, discharged, disposed of and/or deposited various waste products, including but not limited to

the Contaminants and other hazardous substances and waste materials described above, in the neighborhoods surrounding the Plant (hereinafter known as the "Releases").

21.     Additionally, the Defendants' conduct and practices allowed the Contaminants to migrate to and/or become located in the surrounding neighborhoods through emissions in the air and/or flow from surface water, ground water, or discharge into waterways and ground soil.

22.     These neighborhoods affected by the Defendants' operations include the neighborhoods of Collegeville, North Birmingham, Fairmont, Harriman Park, and other surrounding areas ("hereinafter known as "the Neighborhoods").

23.     The Contaminants deposited and/or released by the Defendants' have remained in the Neighborhoods from the time they first arrived on the premises until the present time.  Although the Plant ceased operations in the area in 2010, the effects of their operations are still present in the Neighborhoods and exposure continues to this day.

24.     All of the Contaminants are considered to be harmful to human health by the United States Environmental Protection Agency (hereinafter known as "USEPA").

25.   Lead is a naturally occurring bluish-gray metal found in small quantities in the earth's crust that is used in large quantities in the manufacturing of the type of pipes made by the Plant.

26.   Lead is a bioretentive substance in the sense that it is retained in the blood and/or tissues of living organisms, including humans, exposed to the chemical over time.

27.   Lead is a bioaccumulative substance in the sense that the levels of the chemical will build up and/or accumulate to higher levels in the blood, tissues, and/or bones of living organisms, including humans, exposed to the chemical over time.

28.   Lead is a biopersistent substance in the sense that the chemical will tend to remain present over time in environmental media where it is released and/or comes to be located.

29.   The USEPA has classified lead as a probable human carcinogen and has identified a link between lead and numerous cancerous and non-cancerous health conditions.

30.   Lead is a hazardous substance, hazardous waste, solid waste, toxin, carcinogen, pollutant, and/or contaminant.

31.   Arsenic is a naturally occurring metal that is a waste product of heating many different types of minerals and ores, such as those used at the Plant.

32.    The USEPA has classified arsenic as a known human carcinogen and has identified a link between arsenic and numerous cancerous and non-cancerous health conditions.

33.    Arsenic is a hazardous substance, hazardous waste, solid waste, toxin, carcinogen, pollutant, and/or contaminant.

34.    Beryllium is a hard gray metal that does not occur naturally. Beryllium is used in the manufacturing process of numerous different products, including the manufacturing processes taking place at the Plant.

35.    The USEPA has classified beryllium as a probable human carcinogen and has identified a link between beryllium and numerous cancerous and non-cancerous health conditions.

36.    Beryllium is a hazardous substance, hazardous waste, solid waste, toxin, carcinogen, pollutant, and/or contaminant.

37.    Benzene is a waste product found in the emissions from processes including, but not limited to, the burning of coal and/or oil based products.

38.    The USEPA has classified benzene as a known human carcinogen and has identified a link between benzene and numerous cancerous and non-cancerous health conditions.

39.    Benzene is a hazardous substance, hazardous waste, solid waste, toxin, carcinogen, pollutant, and/or contaminant.

40.     Xylenes are chemical compounds often used in industrial solvents. Xylenes have the potential to be released in either the air or groundwater coming from an industrial site if proper care is not taken.

41.     The USEPA has identified a link between xylenes and numerous human health conditions.

42.     Xylenes are a hazardous substance, hazardous waste, solid waste, toxin, carcinogen, pollutant, and/or contaminant.

43.     Defendants emitted the Contaminants into the air from the Plant into the surrounding environment.

44.     Defendants released the Contaminants into the groundwater from the Plant.

45.     Defendants knew of their emissions of the Contaminants for years without disclosing this information to residents of the Neighborhoods.

46.     Since no later than 1985, the Plant has been subject to inspections by regulatory authorities that test for emissions of waste products, specifically including but not limited to lead.

47.     Just since 1985, the Plant has been cited in excess of 100 times for citations or violations of state and federal environmental regulations for their operation of the Plant.  At least one such violation directly resulted from the release of excess lead in wastewater flowing from the Plant.

48.     Because of these inspections and citations, the Defendants knew or should have known years ago of the harmful effects of releasing emissions such as the Contaminants and/or lead.

49.     In 2012, the USEPA began investigating U.S. Pipe as part of the USEPA's ongoing project at the 35th Avenue Superfund Site (hereinafter known as the "Site").  In September 2013, defendants were named as "potentially responsible part(ies)" for cleanup activities that would take place within the Superfund Site which includes significant parts of the Neighborhoods described herein.

50.     Relevant medical literature and/or scientific research support a link between the Contaminants and the following human blood related illnesses and/or conditions:    1) anemia, 2) hypochromic anemia, 3) microcytic anemia, 4) Myelodysplastic syndrome, and 5) poor blood flow.

51.     Relevant medical literature and/or scientific research support a link between the Contaminants and the following human cancers:  1) cervical cancer, 2) colon cancer, 3) esophageal cancer, 4) Hodgkin's lymphoma, 5) kidney cancer, 6) leukemia, 7) liver cancer, 8) lung cancer, 9) lymphoma, 10) melanoma, 11) nasal cancer, 12) ovarian cancer, 13) stomach cancer, and 14) throat cancer.

52.     Relevant medical literature and/or scientific research support a link between the Contaminants and the following human cardiovascular illnesses and/or

conditions:   1) atherosclerosis, 2) cardiomyopathy, 3) heart attack, and 4) peripheral vascular disease.

53.   Relevant medical literature and/or scientific research support a link between the Contaminants and the following human kidney related illnesses and/or conditions:  1) kidney problems, 2) kidney disease, 3) kidney stones, and 4) end stage renal disease.

54.   Relevant medical literature and/or scientific research support a link between the Contaminants and the following human neurological disorders and/or conditions:  1) attention deficit disorder/ attention deficit hyperactivity disorder, 2) behavioral problems, 3) decreased coordination, 4) disequilibrium, 5) decreased IQ, 6) developmental delays, 7) learning disabilities, 8) mental retardation, 9) seizures, and 10) epilepsy.

55.   Relevant medical literature and/or scientific research support a link between the Contaminants and the following human illnesses and/or conditions related to circulation and/or sensation:  1) numbness of the arms, 2) numbness of the legs, 3) numbness of the hands, 4) numbness of the feet, 5) numbness of the toes, 6) neuropathy, and 7) gout.

56.   Relevant medical literature and/or scientific research support a link between the Contaminants and the following disorders and/or conditions related to human pregnancy and/or reproduction:  1) congenital bronchial cleft crest birth

defects, 2) infantile gastroesophageal reflux, 3) infantile laryngomalacia, 4) delayed growth, 5) miscarriage, and 6) menstrual disorders.

57.   Relevant medical literature and/or scientific research support a link between the Contaminants and the following human respiratory illnesses and/or conditions:  1) aspergillus, 2) asthma, 3) chronic bronchitis, 4) chronic obstructive pulmonary disease, 5) emphysema, 6) hypersensitivity, 7) mesothelioma, and 8) sarcoidosis.

58.   Relevant medical literature and/or scientific research support a link between the Contaminants and the following human skin disorders and/or conditions:  1) hyper-pigmentation, 2) hyperkeratosis, 3) rashes, and 4) blisters on feet.

59.   Relevant medical literature and/or scientific research support a link between the Contaminants and the following other human disorders and/or conditions:   1) hearing loss, 2) vision loss, 3) no sense of smell, and 4) autoimmune disorders.

60.   All of the human illnesses and/or conditions and/or disorders contained in the foregoing paragraphs 50 through 59 are hereinafter known as the "Linked Diseases."

**The Defendants' Misconduct**

61.    Defendants at all times relevant to this complaint knew, or in the exercise of ordinary care should have known, that the Releases from the Plant were poisonous and harmful to human beings.

62.    Defendants at all times relevant to this complaint knew, or in the exercise of ordinary care should have known, that once released into the environment, these Releases from the Plant posed a serious health hazard to humans and would cause injury and potential death to those exposed.

63.    Knowing of their danger, Defendants nevertheless continued to release the Contaminants into the surrounding environment, including the Neighborhoods.

64.    Defendants failed to timely and adequately warn the Plaintiffs and others of the toxic exposure from the Releases and the dangers to both person and property associated therewith.

65.    Defendants specifically disregarded the safety of the Plaintiffs and others by fraudulently concealing the nature of their emissions into the environment.

66.    The Contaminants released into the environment contaminated and continue to contaminate the air, soil, sediment, and ground water in the surrounding area, including the Neighborhoods.

67.    The actions of the Defendants and their employees, agents, officers, and representatives, were negligent, reckless, willful, and wanton, and constitute a disregard for the health and safety of those living, working, or visiting in the surrounding area.

68.    The aforementioned operations and conduct by the Defendants constituted violations of laws intended to protect Plaintiffs and others similarly situated from the effects of the Releases including, but not limited to, the following laws:

(a)    THE RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. §§ 6901, *et seq*. (1976), as amended, as described in 40 CFR Parts 239-282 and in ADEM[1] Admin. Code R. 335-13 and 335 – 14 (hereinafter "RCRA").

(b)    THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT, 42 U.S.C. §§ 9601, *et seq*. (1980), as amended, as described in 40 CFR Parts 370 – 374 (hereinafter "CERCLA").

(c)    SUPERFUND AMENDMENT AND REAUTHORIZATION ACT OF 1986, Pub. L. No. 99-499 (codified as amended in scattered sections of the UNITED STATES CODE), as described in 40 CFR Parts 370

---

[1] "ADEM" refers to the Alabama Department of Environmental Quality.

– 274 (hereinafter "SARA").   This legislation reauthorized CERLA to continue cleanup activities around the country.

(d)   THE EMERGENCY PLANNING COMMUNITY RIGHT TO KNOW ACT, 42 U.S.C. §§ 11001, *et seq*. (1986), as amended, as described in 40 CFR Part 370.   Also known as Title III of SARA, this legislation was enacted to help local communities protect public health, safety, and the environment from chemical hazards.

(e)   OSHA[2] Hazardous Waste Operations and Emergency Response Standard, which applies to all facilities and situations in which workers are exposed to physical or chemical hazards during activities such as cleaning up hazardous waste sites or responding to emergencies involving releases of hazardous materials or wastes under CERCLA or RCRA, as described in 29 CFR §§ 1910.120 and 1926.65.

(f)   THE CLEAN AIR ACT, 42 U.S.C. §§ 7401, *et seq*. (1970), as amended, as described in 40 CFR Parts 50 – 97, and in ADEM Admin. Code R. 335-3 and in the JCDH-APCP[3] Rules and Regulations.

---

[2] "OSHA" refers to the Occupational Safety and Health Administration.
[3] "JCDH-APCP" refers to the State of Alabama Jefferson County Department of Health Air Pollution Control Program.

(g)     THE CLEAN WATER ACT, 33 USCS §§ 1251, *et seq.* (1972), as amended, as described in 40 CFR Parts 100 – 149 and in ADEM Admin. Code R. 335-6.

(h)     THE SOLID WASTE DISPOSAL ACT, 42 USCS §§ 6901 *et seq.*

(i)     THE ALABAMA AIR POLLUTION CONTROL ACT OF 1971, CODE OF ALABAMA §§ 22-28-1, *et seq.*

(j)     THE ALABAMA HAZARDOUS WASTES MANAGEMENT AND MINIMIZATION ACT, CODE OF ALABAMA §§ 22-30-1, *et seq.*

(k)     THE ALABAMA SOLID WASTES DISPOSAL ACT, CODE OF ALABAMA §§ 22-27-1, *et seq.*

(l)     THE ALABAMA ENVIRONMENTAL MANAGEMENT ACT, CODE OF ALABAMA §§ 22-22A-1, *et seq.*

(m)     THE ALABAMA WATER POLLUTION CONTROL ACT, CODE OF ALABAMA §§ 22-22-1, *et seq.*

(n)     THE ALABAMA UNDERGROUND STORAGE TANK AND WELLHEAD PROTECTION ACT OF 1988, CODE OF ALABAMA §§ 22-36-1, *et seq.*

(o)     ADEM Regulation 335-3-3-.05(19)(c).

(p)     ADEM Regulation 335-3-4-.02(1) and (2).

(q)     ADEM Regulation 335-3-14-.01(1)(b).

(r)     ADEM Regulation 335-14-5.

(s)     ADEM Regulation 335-14-7-.08.

(t)     ADEM Regulation 335-14-7-.08, subpart H.

(u)     ADEM Regulation 335-14-X.

69.    The actions of Defendants in violating the foregoing laws and regulations constitute violations of duties imposed by laws intended to prevent harm to the Plaintiffs and other similarly situated people.

**Plaintiffs' Injuries**

70.    For some period of time between 1995 and 2010, when the Plant ceased its operations, each of the Plaintiffs lived, worked, and/or frequented and also owned real property at one or more locations within the Neighborhoods and were exposed to toxicologically significant levels of the Contaminants released from the Plant.

71.    Because of this exposure to the Contaminants from Defendants' North Birmingham plant, each Plaintiff has sustained significant injuries and damages, including but not limited to one or more of the Linked Diseases and damage to their real property in the Neighborhoods.

## COUNT ONE – NEGLIGENCE

72.    The Plaintiffs adopt and incorporate by reference all the foregoing language of this Complaint as if fully set forth herein and further state as follows.

73.     The Defendants had a duty to operate and manage the Plant in such a way as to not create a nuisance or condition causing any injury or damage to human health or to the environment.

74.     The Defendants breached this duty of care by negligently operating and/or managing the Plant and/or conducting other operations and activities at the Plant in such a manner as to negligently cause, permit, and/or allow the Releases, thereby contaminating the air and/or water and/or soil in the Neighborhoods and the blood/body of the Plaintiffs.

75.     As a direct, proximate, and foreseeable result of the Defendants' continuous conduct, practices, and inactions, the Plaintiffs have been caused to suffer, and will continue to suffer, damages resulting from Plaintiffs' personal injuries and the contamination of Plaintiff's real property.

## COUNT TWO – WANTONNESS

76.     The Plaintiffs adopt and incorporate by reference all the foregoing language of this Complaint as if fully set forth herein and further state as follows.

77.     In breaching the duties described above, the Defendants acted in a wanton, willful, and reckless manner.

78.     The Defendants knew or should have known the danger to Plaintiffs created by Defendants' conduct, practices, actions, and inactions.

79.     The Defendants knew or should have known of the likely or probable impact, harm, damage, and injury their conduct, practices, actions, and inactions would have on and/or cause Plaintiffs.

80.     The Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for the Plaintiffs' health, safety, and property.

81.     As a direct, proximate, and foreseeable result of the Defendants' continuous conduct, practices, actions, and inactions, the Plaintiffs have been caused to suffer, and will continue to suffer, damages to Plaintiffs' health and real and personal property.

## COUNT THREE – NUISANCE

82.     The Plaintiffs adopt and incorporate by reference all the foregoing language of this Complaint as if fully set forth herein and further state as follows.

83.     The Defendants owe a duty to the Plaintiffs to exercise due and reasonable care in manufacturing, storage, disposal, and other operations to safely, adequately, and properly use, control, maintain, store, treat, and dispose of various waste substances that have the potential to migrate to the Plaintiffs' property.

84.     The Defendants owe a duty to the Plaintiffs to conduct their operations in such a way as to prevent toxic substances and materials from migrating to and becoming located on Plaintiffs' properties through emission in the air and/or flow through surface water or discharge into waterways.

85.     The Defendants breached their duties owed to Plaintiffs and, under the circumstances, Defendants' breaches constitute a negligent and/or conscious, gross, willful, and/or wanton disregard for the property owned by the Plaintiffs.

86.     The Defendants created and maintained a private nuisance under Alabama law in that Defendants' conduct, practices, actions, and inactions hurt, inconvenience, and damage the property owned by the Plaintiffs.

87.     The hurt, inconvenience, and damage alleged herein is such that it would affect an ordinary, reasonable person.

88.     Under the circumstances, Defendants' conduct, practices, actions, and inactions were accompanied by malice, insult, inhumanity, and/or contempt.

89      As a direct, proximate, and foreseeable result of the Defendants' continuous conduct, practices, actions, and inactions, the Plaintiffs have been caused to suffer, and will continue to suffer, damages to Plaintiffs' real and personal property.

## <u>COUNT FOUR – NEGLIGENCE PER SE</u>

90.     Plaintiffs adopt and incorporate by reference all the foregoing language of this Complaint as if fully set forth herein and further state as follows.

91.     By its acts and omissions resulting in the Releases, Defendants violated one or more applicable United States and Alabama regulations and statutes designed to protect persons such as the Plaintiffs, constituting negligence

per se, including liability for injuries described herein to the Plaintiffs, other exposed individuals, and the public at large associated with the Releases.

92.    Defendants' violation of law proximately caused and continues to proximately cause damage to the Plaintiffs, other exposed individuals, and the public at large in the form of economic damage, property damage, and bodily injury for which the Defendants are liable.

## COUNT FIVE – PAST AND CONTINUING TRESPASS

93.    Plaintiffs adopt and incorporate by reference all the foregoing language of this Complaint as if fully set forth herein and further state as follows.

94.    Defendants owe a duty to the Plaintiffs to exercise due and reasonable care in manufacturing, storage, disposal, and other operations to safely, adequately, and properly use, control, maintain, store, treat, and dispose of various waste substances.

95.    Defendants owe a duty to the Plaintiffs to conduct its operations in such a way to prevent toxic substances and materials from migrating to and becoming located on Plaintiffs' properties through emission in the air and/or flowing surface water or discharge into waterways.

96.    Defendants intentionally and knowingly engaged in the conduct, practices, actions, and inactions that resulted in an invasion of Plaintiffs' person and property as described herein.

97.    Defendants' invasion as described herein affected the Plaintiffs' interests in the exclusive possession of Plaintiffs' properties and constitutes a trespass and continuing trespass under Alabama law.

98.    The invasion and presence of the Contaminants onto the Plaintiffs' properties was and continues to be without permission or authority from Plaintiffs.

99.    Defendants' past and continuing trespass onto the Plaintiffs' properties proximately caused and continues to proximately cause substantial damage to the Plaintiffs and has affected the nature and character of the property.

## COUNT SIX – PUNITIVE DAMAGES

100.   Plaintiffs adopt and incorporate by reference all the foregoing language of this Complaint as if fully set forth herein and further state as follows.

101.   The Defendants' acts and omissions as described above were conducted with such intentional, malicious, wanton, willful, grossly negligent, and/or reckless indifference to the rights of Plaintiffs, other exposed individuals, and the public at large that the Defendants are liable for punitive damages.

102.   The Defendants' acts and omissions as described above were conducted with such flagrant disregard for the safety and wellbeing of Plaintiffs, other exposed individuals, and the public at large that the Defendants are liable for punitive damages.

## COUNT SEVEN – WRONGFUL DEATH

103.   This count applies solely to Plaintiff Teresa Cade Thomas as Personal Representative of the Estate of Elizabeth Juanita Martin.

104.   Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

105.   This claim is brought pursuant to Alabama's Wrongful Death Act, Ala. Code § 6-5-410 (1975), which provides the personal representative of a deceased with a cause of action for a wrongful act, omission or negligence causing death.

106.   The Defendants had a duty to operate and manage the Plant in such a way as to not create a nuisance or condition causing any injury or damage to human health or to the environment.

107.   The Defendants breached this duty of care by negligently operating and/or managing the Plant and/or conducting other operations and activities at the Plant in such a manner as to negligently cause, permit, and/or allow the Releases, thereby contaminating the air and/or water and/or soil in the Neighborhoods and the blood/body of the Decedent.

108.   As a direct, proximate, and foreseeable result of the Defendants' continuous conduct, practices, and inactions, Decedent was caused to suffer from

one or more of the Linked Diseases, including but not limited to myelodysplastic syndrome, which ultimately caused her death.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants, separately and severally, for compensatory damages, special damages, exemplary damages, punitive damages, and all such other damages to which the Plaintiffs may be entitled under Alabama law; and for all such other relief to which Plaintiffs may be entitled under Alabama law.  Plaintiffs demand a trial of this action by struck jury.

Respectfully submitted this 19th day of January 2018,


/s/ Jon C. Conlin
Jon C. Conlin (asb-7024-j66c)
R. Andrew Jones (asb-0096-i11r)
Mitchell Theodore (asb-6549-i00d)
*Attorneys for Plaintiffs*

CORY WATSON, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205
jconlin@corywatson.com
ajones@corywatson.com
mtheodore@corywatson.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2018 a copy of the foregoing First Amended Complaint was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Jon C. Conlin_____
Jon C. Conlin (asb-7024-j66c)
R. Andrew Jones (asb-0096-i11r)
Mitchell Theodore (asb-6549-i00d)
***Attorneys for Plaintiffs***

CORY WATSON, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 35205
jconlin@corywatson.com
ajones@corywatson.com
mtheodore@corywatson.com
